JOHN H. RATCLIFF and WILMA Y. RATCLIFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE
Ratcliff v. Commissioner
Docket Nos. 8598-82, 19660-83.[1]
United States Tax Court
T.C. Memo 1986-457; 1986 Tax Ct. Memo LEXIS 153; 52 T.C.M. (CCH) 580; T.C.M. (RIA) 86457; September 18, 1986. *153 Held: Petitioners' deduction of their pro rata share of small business corporation losses and their distributive share of partnership losses is denied to the extent that the deductions result from lost profits or are otherwise unsubstantiated. Held further, petitioners' claimed investment tax credit is denied to the extent that it is unsubstantiated. John H. Ratcliff, pro se. Arthur L. Skaar, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT *154 AND OPINION WHITAKER, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the years and in the amounts indicated: Year
Deficiency
1977
$3,831
1978
6,819
1979
7,413
The issues presented for consideration are: (1) Whether petitioners are entitled to the following deductions as their pro rata share of Dunbar Resources-Livingston Inc.'s net operating losses: Year
Deduction
1977
$13,940
1978
23,263
1979
$52,699
(2) whether petitioners are entitled to a $4,146.90 deduction in 1977 as their distributive share of Lake Livingston Washateria's losses; (3) whether petitioners are entitled to a $33,333 deduction in 1979 as their distributive share of Lake Livingston Washateria, (Inc.)/Lake Livingston Taxicab, (Inc.'s) losses; (4) whether petitioners are entitled to an investment tax credit in 1979 resulting from Lake Livingston Washateria (Inc.)/Lake Livingston Taxi Cab (Inc.'s) investment in section 38 [2] property. *155 For purposes of convenience, the Findings of Fact and Opinion have been combined. [3]
Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners John H. Ratcliff and Wilma Y. Ratcliff, husband and wife, resided in Ypsilanti, Michigan, at the time they filed their petition herein. During the years at issue, petitioners held an interest in the following entities: (1) Dunbar Resources-Livingston, Inc. (Dunbar); (2) Lake Livingston Washateria (Washateria); and (3) Lake Livingston Washateria, Inc./Lake Livingston Taxicab, Inc. (Washateria/Taxicab). Dunbar
Dunbar was chartered under the laws of the State of Texas on October 21, 1977. On the date of its incorporation, Dunbar elected to file its Federal income tax return as a small business corporation pursuant to section 1372. As of December 31, 1977, petitioners *156 owned 60 of the 180 outstanding shares of Dunbar stock. Dunbar reported an ordinary loss of $41,818.86 on its 1977 Federal income tax return. Of this amount, $40,000 was ostensibly a loss sustained "through improvident judgment recited on 12/12/78 [4] in the District Court of Anderson County, Texas" involving Dunbar's interest in 7 acres of real property acquired from Elija Ratcliff. Dunbar's return indicated that it had "acquired" the property on November 15, 1977, and that it had "sold" the property on December 12, 1977. Dunbar's interest in the Anderson County property resulted from the following events. On September 13, 1973, Elija Ratcliff filed suit against Alfred Jones (Jones) in the District Court of Anderson County, Texas for breach of contract to pay attorney's fees in the amount of $15,000. Elija Ratcliff had represented Jones in a title dispute concerning two tracts of real property situated in Anderson County. On May 20, 1977, Elija Ratcliff filed an amended petition naming Jones as the defendant and D.M. White (White) as the respondent. White was asserted *157 to have secured Elija Ratcliff's professional services on behalf of Jones, and to have had a secondary interest in the action itself. In his amended petition, Elija Ratcliff sought an equitable lien against the Anderson County property through issuance of either a writ of sequestration or a writ of attachment. Attached to the first amended petition was an affidavit dated April 9, 1977, in which the 4-acre tract in Anderson County was valued at $5,000. Elija Ratcliff was awarded an interlocutory default judgment against White on August 25, 1977. On November 15, 1977, Elija Ratcliff executed a deed stating that he had "bargained, released, and sold" to Dunbar all his rights and title to the 4-acre tract of land in Anderson County for $10. The deed from Elija Ratcliff to Dunbar was recorded on December 12, 1977. Also on December 12, 1977, the interlocutory default judgment against White was set aside and White was granted a new trial. On November 6, 1978, judgment was entered against Elija Ratcliff, and on December 20, 1979, the Twelfth Supreme Judicial District of Texas affirmed the trial court's verdict against Elija Ratcliff and its setting aside of his interlocutory default *158 judgment against White. Petitioners contend that the Anderson County property was "donated" by Elija Ratcliff to Dunbar, and that the December 12, 1977, order setting aside the interlocutory default judgment against White, in conjunction with a "fraudulent" sheriff's sale of the property, resulted in a $40,000 ordinary loss to Dunbar. [5] Respondent contends that Elija Ratcliff had no interest in the Anderson County property to convey to Dunbar. Alternatively, respondent maintains that, even if Elija Ratcliff had a contingent interest, his transfer to Dunbar constituted a contribution to capital. Dunbar would take a carryover basis in the property pursuant to section 362. Respondent concludes that Elija Ratcliff had a zero basis in his interest, and therefore that Dunbar also had a zero basis. It is unclear from the record what Elija Ratcliff's interest *159 and basis in the Anderson County property was. The default judgment against White awarded Elija Ratcliff damages in the amount of $15,000 plus court costs and interest. The judgment itself did not award Elija Ratcliff any interest in the Anderson County property. It is clear from the record, however, that whatever interest Elija Ratcliff had in the property was sold to Dunbar on November 15, 1977. Pursuant to the deed between Elija Ratcliff and Dunbar, "all goodwill and title" presently vested in Elija Ratcliff "or to be acquired within the period of one (1) year from the execution hereof" was sold to Dunbar. We realize that the $10 paid by Dunbar was a nominal amount, but the transfer was nonetheless a sale and not a contribution to capital. We stand on the only firm ground available in relying on the deed of sale executed and recorded by Elija Ratcliff. [6] Therefore, we hold that Dunbar had a cost basis of $10 in its contingent interest in the Anderson County property, and that Dunbar is entitled to a loss deduction of $10 in 1979 based upon the Twelfth Supreme Judicial District's affirmation of the trial court's decision on December 20, 1979. Respondent's disallowance of petitioners' *160 deduction is sustained to the extent that such deduction was based upon Dunbar's $40,000 loss. Dunbar claimed an additional loss of $1,592.48 in 1977 resulting from a contract to operate a pulpwood joint venture with Larry Horton in Polk County, Texas. Dunbar's return reported an initial investment of $1,500 in the venture, and repair costs of $92.48. No income was realized by Dunbar on the pulpwood venture in 1977. Petitioners maintain that a "pulpwood vehicle" was purchased and that the initial expenditures were deductible in full for the year of payment because it could not reasonably be contemplated that the asset purchased had a useful life of 6 months without full or substantial replacement. Petitioners' lack of documentation is attributed to the "highly informalized" nature of the pulpwood industry in east Texas. Respondent contends that petitioners have completely failed to substantiate their claim that the truck (presumably what petitioners have referred to as a "pulpwood vehicle") had been exhausted *161 within the year. It is well settled that if an expenditure results in the acquisition of an asset having a useful life of more than 1 year, it is a capital expenditure and its deduction as an expense will be denied. . Furthermore, the burden of proof is on petitioners to substantiate both Dunbar's expenditures and the exhaustion of its pulpwood vehicle. Rule 142(a). Petitioners have come forward with no evidence to substantiate Dunbar's claimed acquisition of a pulpwood vehicle or the payment of repair costs. The informal nature of the pulpwood industry in east Texas does not excuse petitioners total failure to document Dunbar's claimed expenditures. Therefore, respondent's disallowance of petitioners' deduction is sustained to the extent that such deduction was based upon Dunbar's $1,592.48 investment in the pulpwood venture. Dunbar recognized $28.12 in interest income and deducted an additional $254.50 in taxes, franchise fees, and miscellaneous expenses on its 1977 return. Petitioners have failed to provide evidence substantiating any of Dunbar's additional deductions. Therefore, we hold *162 for respondent in disallowing the remainder of petitioners' claimed deductions in 1977 resulting from their interest in Dunbar. Dunbar claimed a loss of $125,000 on its 1978 return based upon the following purported breach of contract. On May 6, 1978, Dunbar executed a joint venture agreement with David Landers and Eugene King, who agreed to act as co-managers of a gasoline service station located at 302 S. Washington, Livingston, Texas. The agreement stated that Dunbar had made arrangements to obtain tanks, pumps, and other equipment essential to the operation of a gasoline service station. Additionally, the agreement stated that Dunbar had negotiated a lease to be executed with Joe Falvey as the owner of the property located at 302 S. Washington. Profits from operation of the gasoline station were to be allocated 50 percent to Dunbar and 50 percent to the co-managers. On June 9, 1978, Dunbar sent a memorandum to M.C. Huges Oil Company, Inc. (Huges) constituting a claim against Huges for breach of a purported contract to provide Phillips Petroleum Company products to the facilities Dunbar had made arrangements to lease at 302 S. Washington. Said memorandum asserted that Huges *163 had agreed, through an authorized representative, to mail Dunbar a formal agreement which was required to be executed "preliminary to honoring an obligation to furnish petroleum products." Dunbar claimed that the agreement was not provided as promised, causing Dunbar to lose its lease of the property located at 302 S. Washington. Loss of said property, resulting from Huges breach of contract to provide Phillips petroleum products, caused "damages through loss of contemplated earnings and profits" in the amount of $250,000. On June 13, 1978, Huges responded to Dunbar's memorandum denying that it had agreed to a specified period of time in which to provide the documents necessary for furnishing products to Dunbar. Additionally, Huges maintained that Dunbar had misrepresented its interest in the property and facilities owned by Falvey. Petitioners claimed that Falvey's and Huges' respective breaches of contract with Dunbar resulted in a loss to Dunbar of $125,000. [7] Petitioners further contend that the "service station contract did not include a clause forbidding proper assignments of interest thereunder so such instrument assumed a fair market value immediately upon its execution. *164 " Respondent claims that Dunbar had no binding contract with Huges and, even if it did, that Dunbar had no basis in that contract. It is not necessary for us to determine the contractual relations between Dunbar, Huges, and Falvey under Texas state law. Petitioners are attempting to deduct the loss of expected future profits. It is well settled that a taxpayer is not allowed to reduce ordinary income actually received by the amount of income he failed to receive. , affg. a Memorandum Opinion of this Court; , affg. a Memorandum Opinion of this Court; see . Indeed, it *165 is axiomatic that a deduction cannot be claimed for profits that will never be reported as income. ; , affd. . Petitioners have made no showing that Dunbar had any basis in the supposed contracts with Huges or Falvey. Therefore, we deny petitioners that portion of their 1978 Dunbar loss attributable to the supposed breach of contracts associated with the operation of a gasoline service station. [8]
Dunbar also claimed a $4,000 loss on its 1978 return attributable to "Ratcliff Enterprises Pulpwood Joint Venture." Petitioners have made no attempt to substantiate the pulpwood joint venture loss of $4,000 claimed by Dunbar in 1978. Thus, petitioners have failed to meet their burden of proof on this issue. Rule 142(a). Respondent has conceded that petitioners are entitled to *166 a deduction of $851.33 in 1978 based upon petitioners' 22.45 percent interest in Dunbar during 1978. In all other respects, we sustain respondent's disallowance of petitioners' claimed deduction resulting from losses passed through by Dunbar in 1978. Dunbar claimed an ordinary loss of $310,000 on its 1979 Federal income tax return based upon losses attributable to Dunbar Taxicab Service (Taxicab) and Dunbar Lawn Service (Lawn). Taxicab was purportedly acquired by Dunbar on October 20, 1978, and sold on November 1, 1979. Dunbar claimed a basis and a resulting loss of $160,000 in Taxicab based upon the following events. On October 20, 1978, Dunbar applied for a permit to conduct a taxicab business within the City of Livingston, Texas. On July 9, 1979, Dunbar executed an assignment of chose in action to Lake Livingston Realty, Inc. (Realty) assigning to Realty "all rights, privileges, and benefits due, accruing or to become due arising out of a certain application and supporting negotiations to secure a permit * * * to operate a taxicab service * * *." On July 13, 1979, Realty filed suit in the United States District Court for the Southern District of Texas against the City of *167 Livingston claiming actual damages of $300,000 and exemplary damages of $800,000. On October 12, 1979, judgment was entered against Realty. Petitioners have failed to demonstrate that Dunbar or Realty had any basis in the application for a taxicab service. Petitioners have again attempted to claim a deduction based upon Dunbar's failure to realize anticipated profits. For the reasons discussed above, we again deny that deduction. See ;;Therefore, we sustain respondent's disallowance of that portion of the deduction attributable to Dunbar's taxicab application. Dunbar claimed a loss of $150,000 on its 1979 return attributable to Lawn. Lawn was reported to have been acquired on March 1, 1979, with a basis of $150,000 and to have been sold on October 15, 1979, for zero. Lawn was a "lawn service venture" whose loss purportedly resulted from "contracted profits." Petitioners provided no evidence substantiating Lawn's basis in the contracts or the events giving rise to the loss. We conclude from the record that Dunbar *168 has again deducted anticipated future profits based upon contracts entered into by, or transferred to, Lawn. Accordingly, we sustain respondent's disallowance of that portion of petitioner's pro rata share of Dunbar's 1979 losses attributable to Lawn. Thus, in the aggregate, we sustain respondent's disallowance of $52,699 of the $53,270 in Dunbar losses claimed by petitioners as their pro rata share in 1979 [9]
Washateria/Washateria, Inc.
Washateria commenced business as a laundry on March 6, 1971, in Livingston, Texas. Lake Livingston Washateria, Inc., (Washateria, Inc.) was incorporated in Texas on May 6, 1971. [10] Elija Ratcliff transferred to Washateria, Inc. all his title, ownership, and rights in the name Lake Livingston Washateria on December 23, 1972. [11] On July 6, 1972, Ed Hasty (Hasty) filed suit against Washateria, Inc. and Elija Ratcliff in the district Court of Polk County, Texas for breach of contract concerning installation of a concrete foundation and construction of a metal building. Hasty claimed actual damages of $5,605, exemplary damages *169 of $20,000, and attorney's fees of $4,000. In his petition, Hasty claimed a lien against the property owned by Washateria, Inc. in the amount of $7,605 and attached a notice of lis pendens giving notice of his intent to foreclose against Washateria, Inc.'s real property. On October 13, 1972, Hasty's motion for summary judgment was granted awarding Hasty $5,605 in damages and $2,000 in attorney's fees. The court ordered Washateria, Inc.'s property foreclosed upon and sold at a sheriff's sale. On April 27, 1973, a Sheriff's Deed was filed stating that Hasty had purchased Washateria, Inc.'s and Elija Ratcliff's interests in the real property for $500. On July 2, 1973, Elija Ratcliff filed a complaint as attorney for Washateria, inc. against Hasty, requesting the court to enjoin Hasty from interfering with Washateria, Inc.'s operations. *170 On July 29, 1977, Washateria, Inc.'s action against Hasty was dismissed. The District Court's decision was affirmed by the Fifth Circuit Court of Appeals on December 29, 1977. Washateria filed a partnership return for 1977 reporting an ordinary loss of $64,691.99. Petitioners claimed a loss of $4,147 on their 1977 Federal income tax return resulting from a loss on the "capital stock" [12] of Washateria. Neither party discussed this deduction at trial or on brief. Washateria reported a loss of $64,691.99 on its 1977 return for "all realty and other assets at business headquarters in Onalaska, Polk County, Texas" as of the date Washateria, Inc.'s action against Hasty was dismissed. No evidence was submitted as to Washateria's basis in the foreclosed property, or as to petitioners' basis in Washateria. Petitioners have failed to demonstrate when the loss occurred, who the loss was incurred by, and what petitioners' interest was. Therefore, we sustain respondent's disallowance of petitioners' deduction of their *171 purported distributed share of Washateria's losses for 1977. Washateria/Taxicab
Washateria/Taxicab began business on February 28, 1970, and claimed an ordinary loss of $100,000 on its 1979 partnership return. The claimed loss resulted from the involuntary conversion of contractual rights belonging to Lake Livingston Taxicab (Inc.). In brief, petitioners have again attempted to deduct the loss of anticipated future profits resulting from the denial of an application for a taxicab permit by the City of Livingston. We again decide this issue for respondent, and deny petitioners their claimed $33,333 loss resulting from their interest in Washateria/Taxicab. Investment Tax Credit
Petitioners claimed an investment tax credit of $2,374 in 1979 based upon their $24,767.88 share of $74,903.62 in claimed expenditures by Washateria/Taxicab. Petitioners have wholly failed to substantiate their naked assertion that the assets were purchased, that they constituted qualified personal property, and that they were placed in service in 1979. We hold that petitioners are not entitled to any investment tax credit in excess of the $3.71 allowed in 1978 and $1.81 allowed in 1979 by respondent *172 on brief. Decision will be entered under Rule 155.
Footnotes
1. By Order dated February 27, 1984, docket Nos. 8598-82 and 19660-83 were consolidated for trial, briefing, and opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
3. On April 11, 1984, petitioners filed a Motion to Annul Notices of Deficiencies and Dismiss for Cause; said motion was taken under advisement by this Court by order dated May 15, 1984. For the reasons stated in this opinion, said motion is hereby denied.↩
4. The date recorded on the return was a typographical error. The judgment was recited on 12/12/77.↩
5. We have no evidence as to how the $40,000 valuation placed upon the property by Dunbar was computed. Elija Ratcliff signed an affidavit on April 9, 1977, stating that the property was worth only $5,000. Elija Ratcliff's interest in the property was contingent at best, and would therefore be worth significantly less.↩
6. Respondent does not contend that the deed was fictitious. Neither is there any evidence in this record to support respondent's contribution to capital theory.↩
7. Dunbar originally claimed a loss of contemplated earnings and profits in the amount of $250,000 based on anticipated profits of $25,000 per year over an expected operational period of 10 years. On brief, petitioner contended that Dunbar would net a minimum of $10,000 per year over the expected 10-year period. It is not clear from the record how the final figure of $125,000 in lost profits was computed.↩
8. We take judicial notice of , wherein this Court disallowed the deduction of this same loss purportedly sustained by Dunbar and passed through to other shareholders of Dunbar.↩
9. Respondent allowed petitioners a deduction of $571 in 1979 as their pro rata share of losses incurred by Dunbar.↩
10. Washateria, Inc.'s corporate charter was revoked by the State of Texas on March 10, 1975, for failure to file a franchise tax report. ↩
11. The relationship between Washateria and Washateria, Inc. is not clear from the record. Both the 1977 return for Washateria and the 1979 return for Washateria, Inc. use the same employer identification number.↩
12. Petitioners do not explain how they acquired capital stock in a partnership; we can only surmise that the investment, if any, was actually in Washateria, Inc.↩